UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW S. F., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19 CV 1706 (JMB) |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On May 23, 2016, plaintiff Matthew F. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of February 28, 2016. (Tr. 168-69). After plaintiff's application was denied on initial consideration (Tr. 75-86), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 93-94).

Plaintiff and counsel appeared for a hearing on August 7, 2018.[1] (Tr. 25-66). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Brenda G. Young, M.A. The ALJ issued a decision denying plaintiff's application on October 9, 2018. (Tr. 8-24). The Appeals Council denied

---

[1] Plaintiff initially appeared without counsel on March 19, 2018. (Tr. 67-72). After discussion with the ALJ, he decided to postpone the hearing until he had obtained counsel.

plaintiff's request for review on April 26, 2019.  (Tr. 1-65).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in July 1978 and was 37 years old on his alleged onset date.  He had an Associate's degree in business administration and had worked as a residential substance abuse counselor since 2000.  (Tr.  31-32, 210).  He lived with his wife and two teenaged children.  (Tr. 35).  Plaintiff listed his impairments as bulging disc, stenosis, and bone spurs in his neck; a missing piece in his spine; bone spurs in his shoulders; numbness in his hand, arm, and leg; and weakness in his hand and arm.  (Tr. 197).  When he filed his application in May 2016, his medications included an antibiotic and steroid for pneumonia; bupropion for depression; ibuprofen, meloxicam, and Neurontin for pain; hydrochlorothiazide for high blood pressure; and a statin for high cholesterol.  (Tr. 200).   In April 2017, his pain medications included baclofen and tramadol.  (Tr. 266).  And, in May 2017, he was prescribed gabapentin, nortriptyline, and meloxicam for pain; Fetzima for depression; omeprazole for GERD; tizanidine for spasms; primidone for tremors; and a statin for high cholesterol.  (Tr. 285).

In his June 2016 Function Report (Tr. 232-42), plaintiff stated that he was unable to work because he experienced pain and numbness after using his arms for more than a minute or two, and was unable to sit, stand, or lie down for long periods of time.  His pain interfered with his sleep.  He had to "make very slow methodical movements" to complete his personal care.  He had to stop computer work frequently both to rest his arms and to get feeling back in his legs by walking around.  His daily activities consisted of driving his wife and children to work and school, watching television, and surfing the internet.  He was able to prepare simple meals, sweep the floors, put

away laundry, and manage financial accounts.  Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentrating, and using his hands.  He had no difficulty paying attention, following instructions, or getting along with others.  His ability to handle stress had declined.  He could walk a block or two before he needed to rest for 10 to 15 minutes.  He used a cane on occasion.  He did not state that he was depressed or had sleep apnea.

At his August 2018 hearing, plaintiff testified that he had pain in his neck, shoulders, and back that radiated down his arms to his fingers and down his legs to his toes.  His daily pain level when taking medication was at level seven or eight on a 10-point scale.  (Tr. 41).   Injections to treat his back and shoulder pain provided no relief.  He experienced numbness in his hands and was unable to lift more than 10 pounds without experiencing pain in his arms, neck, and back.  He frequently dropped things and could not manipulate with his hands and fingers very well.  (Tr. 39-40).  His back and shoulders started to burn after sitting and he had to stand up every 10 to 15 minutes, but he could not stand for very long.  (Tr. 36, 34).  Plaintiff testified that after 25 minutes of sitting at the hearing, he was breaking out in a cold sweat, his arms were on fire, his back hurt, and he had to keep moving his legs to relieve knee pain.  He also described pain in his upper back, shoulders, and arms.   (Tr. 46).  When he walked, he limped and felt weak, as though his legs were not there.  (Tr. 37).   He used a cane two or three times a month when he had increased pain.  He usually only drove short distances and had to reposition his arms frequently.  After 30 minutes of driving, he had to stop and walk around to get the feeling back in his body.  (Tr. 38).  He spread shopping trips across several days.  Plaintiff relied on help from his children to complete household chores and yardwork.  (Tr. 42).  He attended their school and sports activities "no matter what" but did not attend any other social events.

Plaintiff received his primary medical care from nurse practitioner Patricia Allen, whom he saw on a monthly or bimonthly basis. He also saw a pain management specialist and a neurologist. (Tr. 43). He was scheduled to see a neurosurgeon. About two years before the hearing, plaintiff began experiencing tremors. Medication made his tremors more manageable. (Tr. 45, 47-48). In 2013, he had bariatric surgery to address back pain. (Tr. 297, 48-49). At that time, he weighed 399 pounds. He lost 100 pounds after the surgery but presently weighed 366 pounds. He had sleep apnea which was successfully managed with a CPAP machine but he still had daytime sleepiness. He had two or three bad days a week, on which he simply fell asleep. His concentration was always poor but, on "bad days" with a lot of pain, it was "horrible." (Tr. 50). He found his inability to focus very frustrating and he had begun stuttering for the first time in his life.[2] His memory had always been poor but it had worsened in the last two years. (Tr. 56). He took medication to treat his depression but did not feel like it was very effective. (Tr. 55-56). A self-described workaholic, he had worked since he was "a kid" and it "kill[ed]" him that he couldn't provide for his family. (Tr. 51-52). In the past, he kept himself "extra busy," with things like detailing cars with a family member or helping people move. One of his hobbies had been woodworking and he had tried to keep up with it but, he testified, it had been six months since had been able to do any woodworking.

Vocational expert Brenda Young testified that plaintiff's past work as a substance abuse counselor was performed as light, skilled work.[3] (Tr. 60). The ALJ asked Ms. Young to testify

---

[2] Ms. Allen stated in her medical source statement that he had a childhood-onset fluency disorder. (Tr. 556-57).

[3] Ms. Young testified that the Dictionary of Occupational Titles (DOT) quoted substance abuse counselor as sedentary with a Specific Vocational Preparation (SVP) level of 8 performed by someone with a four-year degree. (Tr. 58, 63). Plaintiff had a two-year degree and "usually" lifted under 20 pounds. (Tr. 59, 63). Thus, she characterized his work, as performed, as light with an SVP of 7. In his work history report, plaintiff stated that he frequently lifted less than 10 pounds. (Tr. 222).

about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to light work but could sit for no more than four hours and could stand or walk for six hours in an eight-hour day; could occasionally climb stairs and ramps; could occasionally balance, stoop, kneel, crouch, and crawl; and could frequently handle, finger and reach in all directions.  According to Ms. Young, the individual would be able to perform plaintiff's past work.  In addition, the individual could perform work as a retail clerk, laundry folder, and dining attendant, all of which were characterized as light and unskilled.  (Tr. 61).  If the individual also needed to move for 5 minutes after every 30 minutes of sitting while remaining on task, plaintiff's past work would be precluded but the other work would remain.  (Tr. 61-62).  All work would be precluded if the individual were further restricted to only occasional handling and fingering.  In response to questions from plaintiff's counsel, Ms. Young testified that all work would be precluded for an individual who required unscheduled 20-minute breaks, was off-task 20 percent of the time, or who had three or more unscheduled absences each month.  (Tr. 65).

### B.   <u>Medical Evidence</u>

Plaintiff was diagnosed in 2008 with hyperlipidemia and lowered glucose tolerance, and in 2011 with sleep apnea and hypertensive disorder, and in 2013 had bariatric surgery.  (Tr. 297).  In 2013, he started taking medications to treat depression, GERD, high cholesterol, and hypertension.  (Tr. 298).  He was treated for pneumonia in December 2014.  (Tr. 301-06).

During the period under review, plaintiff was treated for musculoskeletal complaints by his primary care provider and a pain specialist and was evaluated by a neurologist after he developed a stutter and tremor.  He underwent nerve conduction studies, x-rays, and MRIs. Rheumatoid arthritis and multiple sclerosis were ruled out as causes for his symptoms.  (Tr. 331, 400).  A sleep study showed that he suffered from severe obstructive sleep apnea and

oxyhemoglobin desaturation.  (Tr. 374-75, 387-88).  His sleep efficiency improved and he had

more daytime energy with the use of a CPAP machine.  (Tr. 379, 391, 411, 414).  In 2018, plaintiff

was briefly hospitalized with another bout of pneumonia.  Throughout this period, his body mass

index (BMI) was between 45 and 50 and he took medication to treat depression.  More specific

complaints and findings are addressed below.

In December 2015, plaintiff's primary care provider Patricia Allen, FNP, treated plaintiff

for bilateral shoulder pain that radiated into both hands.  (Tr. 312-16).  On examination, Ms. Allen

noted muscle spasm in the cervical spine, tenderness in the lumbar spine, and mildly reduced

ranges of motion in both regions.  Plaintiff was assessed with intervertebral disc degeneration in

the lumbar region, worsening cervicalgia, radiculopathy affecting an upper extremity, chronic

hypertension, elevated BMI, GERD, and depression.  He was advised to exercise for 30 minutes

three times a week to strengthen his back and abdominal muscles, lose weight,[4] and take his

medications, which included the antidepressant bupropion, the muscle relaxant cyclobenzaprine,

the nonsteroidal anti-inflammatory (NSAID) meloxicam, hypertension medication, and a proton

pump inhibitor for GERD.  Imaging showed reversal of the normal lordotic curve in the cervical

spine — possibly due to muscle spasm, spondylosis at C5-C6, smaller osteophytes at C6-C7 and

at multiple levels of the lumbar spine, and a questionable pars defect[5] at L5.  (Tr. 362-63).  On

February 5, 2016, plaintiff reported to Ms. Allen that meloxicam was not strong enough and he

---

[4] The exercise and weight loss recommendations were repeated at every visit by Ms. Allen and, later, by pain specialist Dr. Manchanda.

[5] Pars defect, spondylosis, and stress fracture are terms used interchangeably to describe a "stress fracture through the pars interarticularis of the lumbar vertebrae. The pars interarticularis is a thin bone segment joining two vertebrae. It is the most likely area to be affected by repetitive stress. This condition is fairly common and is found in one out of every 20 people."  https://www.hopkinsmedicine.org/health/conditions-and-diseases/spondylolysis (last visited on Mar. 31, 2020).

had numbness in his right thumb that radiated to his shoulder and neck. (Tr. 317-21). His examination was unremarkable, with the exception of poor insight and judgment.

On February 29, 2016, plaintiff reported to Robert Lander, M.D., that he had had neck and shoulder pain since childhood but that it had worsened and presently rated at level 8 on a 10-point scale. (Tr. 353). On examination, plaintiff had full ranges of motion with pain at his neck and shoulders. He had good muscle strength and normal results on neurological examination of his upper extremities. X-rays of both shoulders were unremarkable while x-rays of his neck showed degenerative arthritis. Imaging of the lumbar spine showed possible bilateral spondylosis at L-5, but the images were "impossible to read." (Tr. 371). A nerve conduction study of the upper extremities showed no evidence of neuropathy or entrapment, with possible radiculopathy at C7. (Tr. 366). On March 7, 2016, Dr. Lander noted that plaintiff had a normal neurological examination and ordered an MRI of the cervical spine, which was completed on March 30, 2016. (Tr. 355). The findings, which were limited by "extensive motion artifact," included straightening of the cervical lordosis, with moderate loss of disc height at C-5 and C-6. (Tr. 330). There was no compression deformity or subluxation and the signal in the cervical and upper thoracic cord was normal and uniform. There were disc/spur complexes and facet arthrosis resulting in severe bilateral encroachment at C4-C5, C5-C6, and C6-C7, and mild central canal stenosis. At C5-C6, a disc herniation abutted the ventral cord with cord flattening and displacement. He was directed to consult a neurosurgeon. (Tr. 357).

During the remainder of 2016, plaintiff continued to complain of pain in his neck, back, and shoulders that radiated into his arms and legs. (Tr. 411-14, 415-18). On examination, Ms. Allen noted weakness in the cervical spine, tenderness in the lumbar spine, mildly reduced range of motion, and pain with motion. (Tr. 411-14). In November 2016, plaintiff told pain specialist

Vivek Manchanda, M.D., that he had severe pain in his neck and low back that radiated to his arms and legs.  On examination, plaintiff had tenderness to palpation at C-5, C-6, C-7, L-4, and L-5, and bilateral paraspinal muscles and trapezius.   (Tr. 466-69).   These findings remained comparatively stable throughout Dr. Manchanda's treatment of plaintiff.  (Tr. 498-501, 454-57, 667-70, 664-66, 661-63, 657-60, 654-54, 651-53).  He had bilateral positive responses to cervical distraction, Spurling's and Straight Leg Raise (SLR) tests.  Dr. Manchanda assessed plaintiff with cervical disc disorder with myelopathy; connective tissue and disc stenosis of intervertebral foramina of the cervical region; and spondylosis without myelopathy or radiculopathy at the cervical region.  Dr. Manchanda started plaintiff on the muscle relaxant baclofen and increased the dosage of the gabapentin he was already taking.  He also administered an interlaminar steroid injection at C7-T1.  (Tr. 460-62).

In January 2017, plaintiff reported that he was limping and an x-ray disclosed a heel spur on his right foot.  (Tr. 423-26, 477).  Ms. Allen assessed him with gouty arthritis and started him on prednisone and tramadol.[6]  X-rays of the lumbar spine showed bilateral L5 spondylosis with minimal anterolisthesis that was unchanged from February 2016 and was stable with movement. (Tr. 474).  In addition, the x-rays showed multiple Schmorl's nodes, mild multilevel degenerative disc disease, and facet osteoarthritis.  In February 2017, Ms. Allen noted that plaintiff had a claw toe.[7]  (Tr. 427-30).  On examination, plaintiff was chronically-ill appearing, and had a protuberant

---

[6] Plaintiff later reported that he stopped taking tramadol because he did not care for how it made him feel. (Tr. 498).

[7] Podiatrist Carmino Quiroga, DPM, noted edema of the dorsal right foot and recommended an MRI.  (Tr. 560-62).

abdomen, cervical spine weakness, lumbar spine muscle spasm, and moderately reduced ranges of motion at the cervical and lumbar spine.  She prescribed allopurinol[8] and colchicine.[9]

In February 2017, Dr. Manchanda noted that plaintiff continued to have tenderness to palpation along the vertebrae and paraspinal muscles.  (Tr. 498-501).  He complained of pain in both knees but had full range of motion.  He had decreased range of motion of the neck, full range of motion of the thoracic spine, and full painless range of motion of the lumbar spine.  Dr. Manchanda noted bilateral positive responses to SLR, Spurling's test,[10] FABER test,[11] and facet loading at the lumbar spine, while cervical distraction tests were negative.  Dr. Manchanda assessed plaintiff with cervical disc disorder at C6-C7 with radiculopathy, connective tissue and disc stenosis of intervertebral foramina of the cervical region, spondylosis without myelopathy or radiculopathy at the cervical region, radiculopathy of the cervicothoracic region, other spondylosis with radiculopathy at the lumbosacral region, and knee pain.  Imaging of the knees was unremarkable.  (Tr. 484-85).  A lumbar medial branch was administered in March 2017.  (Tr. 490-92).

In July 2017, plaintiff complained to Dr. Manchanda of pain in his left shoulder, which he rated at level 8.  (Tr. 454-57).  On examination, plaintiff had decreased range of motion at the neck

---

[8] Allopurinol is prescribed to treat gout and other conditions caused by excessive uric acid.  See https://medlineplus.gov/druginfo/meds/a682673.html (last visited Mar. 31, 2020).

[9] Colchicine is prescribed to prevent gout attacks.  https://medlineplus.gov/druginfo/meds/a682711.html (last visited Mar. 31, 2020).

[10] "The Spurling's test . . .  is used during a musculoskeletal assessment of the cervical spine when looking for cervical nerve root compression causing Cervical Radiculopathy."  https://www.physio-pedia.com/Cervical_Radiculopathy (last visited Apr. 3, 2020).

[11] "The FABER (Patrick's) Test stands for: Flexion, Abduction and External Rotation. These three movements combined result in a clinical pain provocation test to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region."  https://www.physio-pedia.com/FABER_Test (last visited Apr. 3, 2020).

and shoulders, with tenderness to palpation over his shoulder and acromioclavicular joints. Dr. Manchanda assessed plaintiff with pain in both shoulders and ceased the prescription for baclofen and started plaintiff on tizanidine.[12]  He administered bilateral glenohumeral joint injections.  (Tr. 447-53).   Approximately two weeks later, plaintiff reported that he had more movement in his shoulder but his pain was still at level 8.  Dr. Manchanda added osteoarthritis in the shoulders to the list of assessments.  (Tr. 667-70).  In September 2017, Ms. Allen noted that plaintiff still complained of severe shoulder pain and weakness.  (Tr. 507-13).

Plaintiff told Ms. Allen in June 2017 that he had been experiencing dizziness for three months.  (Tr. 431-34).  On examination, she noted impaired balance, unsteady gait, tremors, and mild expressive aphasia and she referred him to a neurologist.  Plaintiff was evaluated by neurologist Andrew Godbey, M.D., on September 29, 2017.  (Tr. 642-45).  Plaintiff stated that he first experienced a tremor in his hands as a teenager and that it had slowly progressed.  It was worse with stress.  On examination, plaintiff had normal muscle strength, ranges of motion, coordination, reflexes, gait, and stance.  He had decreased sensation to pinprick in both index fingers and right forearm.  Dr. Godbey diagnosed plaintiff with essential tremor and postural tremor that interfered with his daily activities.  He prescribed the beta blocker propranolol.

On October 10, 2017, plaintiff rated his pain at level 9.  He also told Dr. Manchanda that he had been stuttering for two weeks.[13]  (Tr. 664-66).  On examination, plaintiff continued to exhibit tenderness to palpation and had a positive response to facet loading.  SLR, FABER's, and

---

[12] Tizanidine is a skeletal muscle relaxant.  See https://medlineplus.gov/druginfo/meds/a601121.html (last visited Mar. 31, 2020).

[13] Dr. Manchanda referred plaintiff back to the neurologist for evaluation of the stuttering.  Plaintiff had not mentioned a stutter on his initial visit to Dr. Godbey on September 29, 2017, less than two weeks before he reported it to Dr. Manchanda.  He also did not mention it to Dr. Godbey at his scheduled six-month follow-up in April 2018.  (Tr. 645-47).

piriformis stretch tests were all negative.  He had decreased sensation in his right forearm.  He had decreased rotation of the neck, full range of motion at both shoulders, and full and painless range of motion of the lumbar spine.   Two weeks later, plaintiff told Ms. Allen that his stuttering continued and he was struggling to remember simple tasks.  (Tr. 514-19).  On limited examination, Ms. Allen noted that plaintiff was chronically ill-appearing, with jerky movements and tremors. In November 2017, plaintiff complained of musculoskeletal pain, joint pain, dizziness, weakness and numbness in his extremities, gait disturbance, memory impairment, tremors, and fatigue.  (Tr. 520-23).  On examination, he had limited range of motion and decreased sensation of the cervical spine, pain in the lumbar spine and ankles with motion, and decreased strength in the knees.  On neurological examination, his short-term memory was slightly impaired, and he had decreases in his "position sense" of the upper and lower extremities.  He displayed an unsteady gait with waddling and stiff movements.  Ms. Allen noted that he had frequent falls.  In December 2017, Dr. Manchanda noted that plaintiff had full range of motion at both shoulders with continued tenderness to palpation.  Facet loading at the lumbar spine was positive, but SLR, FABER, and piriformis tests were all negative.  Dr. Manchanda ordered MRIs of plaintiff's shoulders, the results of which do not appear in the record, and referred him to a neurosurgeon at St. Louis University to follow up on his pain.  He again counseled plaintiff on the necessity to lose weight and plaintiff agreed to contact his bariatric surgeon.  (Tr. 661-63).

Plaintiff complained to Ms. Allen of worsening fatigue and malaise in February 2018 and she diagnosed him with a moderate episode of major depressive disorder.  (Tr. 543-47).  His examination was unremarkable with the exception of a notation that he was chronically ill-appearing.  In March 2018, plaintiff told Dr. Manchanda that the injections had not improved his

pain, which he rated at level 7.[14]  (Tr. 654-56).  Later that month, plaintiff was admitted to the hospital for two days with pneumonia.  (Tr. 574-90).  On April 11, 2018, Ms. Allen noted that the pneumonia had improved.  (Tr. 548-53).  He continued to have frequent falls.  Ms. Allen prescribed the antidepressant Fetzima.

In April 2018, the neurologist Dr. Godbey noted that propranolol improved plaintiff's tremors but caused lightheadedness and he had fallen four times in the past two months.  (Tr. 645-47).  Dr. Godbey concluded that the medication had caused a drop in plaintiff's blood pressure and switched him to the anticonvulsant primidone.[15]  In June 2018, plaintiff told Dr. Manchanda that he felt sharp, stabbing impulses down his arms. (Tr. 651-52).  He had fallen five or six times since March.  His MRIs had been provided to a surgeon at Saint Louis University.

### C.    Opinion Evidence

On July 29, 2016, Marsha Toll, Psy.D., completed a Psychiatric Review Technique form based on a review of the records.  (Tr. 79-81).  Dr. Toll concluded that plaintiff had a medically determinable impairment in category 12.04 (affective disorders), but that his impairment was non-severe. Dr. Toll noted that as, of April 2016, plaintiff presented as fully oriented, with good insight and judgment, and appropriate mood and affect.  He was treated only with antidepressant medication prescribed by his primary care provider and had never received treatment from a specialist or had counseling, emergency care, or inpatient treatment for a mental disorder.  Dr. Toll opined that plaintiff had no restrictions in the activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace.  He had no episodes of decompensation of an extended duration.  The ALJ did not address Dr. Toll's opinion.

---

[14] Dr. Manchanda ordered MRIs of plaintiff's lumbar and cervical spines.  (Tr. 659).  The results do not appear in the record.

[15] See https://medlineplus.gov/druginfo/meds/a682023.html (last visited Mar. 31, 2020).

Ms. Allen completed a medical source statement on May 18, 2018.  (Tr. 556-57).  She noted that she had seen plaintiff every three months since December 2015.  She listed plaintiff's diagnoses as cervicalgia, major depressive disorder, aphasia, repeated falls, GERD, gout, obstructive sleep apnea, other intervertebral disc degeneration of the lumbar region, radiculopathy, pain in the right foot, childhood onset fluency disorder, and unspecified tremor.[16]  His symptoms included fatigue, cognitive deficits, unstable walking, vision issues, muscle spasm, speech difficulties, pain, poor concentration, numbness, tingling, swelling, balance problems, depression, tremor, headaches, nausea, and weight increase.  She opined that he could sit, stand, or walk less than two hours in an eight-hour work day, would require periods of walking around, the ability to shift at will, and breaks of 20-minute duration every 30 minutes.  He should elevate his legs with prolonged sitting and use a cane.  He could only occasionally lift less than 10 pounds and never more.  He could occasionally twist, stoop or bend, crouch, and climb stairs.  He could occasionally handle, reach, finger, and feel.  His depression contributed to the severity of his pain and his pain reduced his concentration and attention.  He would be off task more than 20% of an eight-hour day and would be absent more than three days per month.  To support her findings, Ms. Allen cited plaintiff's depression, tremor, and unstable gait.

The ALJ gave Ms. Allen's opinion little weight because it was inconsistent with the treatment records which documented only mild to moderate abnormalities.  Furthermore, the opinion did not cite the specific impairments that would cause such limitations.  Finally, as a nurse practitioner, Ms. Allen was not an acceptable medical source as defined by the Social Security regulations.  (Tr. 18).  Plaintiff does not challenge the ALJ's assessment of Ms. Allen's opinion.

---

[16]  Ms. Allen listed only the ICD 10 codes, the descriptions for which can be found at https://www.icd10data.com/ (last visited Mar. 30, 2020).

### III.  <u>Standard of Review and Legal Framework</u>

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.
See <u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>Pearsall v.
Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c
(a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment
or impairments are of such severity that he is not only unable to do his previous work but cannot,
considering his age, education and work experience, engage in any other kind of substantial gainful
work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  <u>See
also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining
whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th
Cir. 2009).  Steps one through three require the claimant to prove (1) he is not currently engaged
in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets
or equals a listed impairment.  <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009); <u>see</u> <u>also</u>
<u>Bowen</u>, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from
a listed impairment or its equivalent, the analysis proceeds to steps four and five.  <u>Pate-Fires</u>, 564
F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity
(RFC), which is the most a claimant can do despite [his] limitations." <u>Moore</u>, 572 F.3d at 523
(citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return
to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental

demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health

& Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above, terminating at step four.  (Tr. 11-19).  The ALJ found that plaintiff met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since February 28, 2016, the alleged onset date.  (Tr. 13).  At step two, the ALJ found that plaintiff had the severe impairments of abnormalities of the cervical, thoracic, and lumbar spine, to include degenerative disc disorder, cervical disc disorder, radiculopathy in the cervical and thoracic regions, spondylosis in the lumbosacral region with pain in the lower extremities, connective tissue and disc stenosis of intervertebral foramina in the cervical region, hypertension, and obesity.  The ALJ did not address or mention plaintiff's depression or sleep apnea.  The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  The ALJ summarily stated that he had given specific attention to listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine) but did not set forth his analysis.  By contrast, the ALJ fully addressed plaintiff's hypertension

before concluding that it did not satisfy listings 4.02 and 4.04.  The ALJ also addressed plaintiff's obesity and concluded that it did not limit his ability to perform within the RFC found below.  (Tr. 13-14).

The ALJ next determined that plaintiff had the RFC to perform light work but was limited to sitting for four hours in an eight-hour workday and had to stand or walk for six hours in an eight-hour workday.  He could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch, or crawl; and could frequently handle and finger and reach in all directions.  (Tr. 14).  In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding his abilities, conditions, and activities of daily living.  (Tr. 14-18).  While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of his symptoms were "not entirely consistent with" the medical and other evidence.  (Tr. 15).  The ALJ stated that "it is reasonable that [plaintiff] has some reduced range of motion and limitations as a result of his impairments," and that, "[while] objective tests substantiate [his] complaints of a back impairment, testing of his extremities often resulted in normal findings."  (Tr. 15).

At step four, the ALJ concluded that plaintiff was able to return to his past relevant work as a substance abuse counselor, which was classified as light work.  (Tr. 18-19).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from February 28, 2016 — the alleged onset date — through October 12, 2018 — the date of the decision.  Id.

## V.  <u>Discussion</u>

Plaintiff argues that the ALJ erred in failing to consider evidence of his depression and sleep apnea; in failing to consider whether plaintiff's impairments meet or equal listing 1.04

(disorders of the spine); and in failing to resolve conflicts between the vocational expert's testimony and the DOT.

### A.     Failure to Address All Impairments

Plaintiff argues that the ALJ erred by failing to address his depression or sleep apnea and include restrictions on his concentration, pace and reliability in the RFC.  Defendant concedes that the ALJ did not mention plaintiff's depression and sleep apnea in the decision.  [Doc. # 19 at 10]. Nonetheless, defendant argues that remand is not necessary because (1) plaintiff failed to claim depression and sleep apnea in his application for benefits; (2) the ALJ did not ignore depression and sleep apnea; and (3) substantial evidence in the record supports the ALJ's determination that depression and sleep apnea were not severe impairments.

Defendant correctly states that plaintiff did not list depression and sleep apnea in his application.  (Tr. 197).  In the supporting documents, however, plaintiff listed both his treatment for depression with antidepressant medication and described fatigue as a limitation on his capacity function.  (Tr. 200, 202, 285, 247).  He also testified about his depression and sleep apnea at the hearing.  Furthermore, at the initial determination stage, plaintiff's diagnosis with severe obstructive sleep apnea was noted and his depression was addressed in a psychiatric review technique.  (Tr. 83, 79-81).  Thus, plaintiff's depression and sleep apnea were sufficiently presented to the ALJ to require consideration.  See 20 C.F.R. § 416.912(a) and 20 C.F.R. § 1412(a) ("We will consider only impairment(s) you say you have or about which we receive evidence.") (emphasis added); see also Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005) (rejecting Commissioner's argument that plaintiff's failure to include borderline intellectual functioning in application or at hearing precluded remand); Harper v. Colvin, No. 1:14 CV 31 ACL, 2015 WL

18

5567978, at *5 (E.D. Mo. Sept. 22, 2015) (finding that "the ALJ was certainly on notice" of the claimant's borderline intellectual functioning, even though not alleged in application).

Although the ALJ did not address or even mention plaintiff's depression and sleep apnea, defendant nonetheless asserts that the ALJ did not ignore these conditions and, indeed, concluded that they were not severe impairments. Defendant reaches this position by noting, first, that Ms. Allen cited plaintiff's depression and fatigue as support for her opinion regarding his limitations and, second, that the ALJ considered and rejected Ms. Allen's opinion. Thus, defendant reasons, the ALJ must have considered plaintiff's depression and fatigue.[17] (Tr. 10-12). In assessing Ms. Allen's opinion, however, the ALJ specifically stated that she had not referred to the specific impairments that supported her limitations. (Tr. 18). This statement undermines defendant's assertion that the ALJ considered the effects of plaintiff's depression and sleep apnea.

The ALJ is required to assess a claimant's impairments at two stages of the sequential analysis. First, at step two, the ALJ identifies those impairments, singly and in combination, that are "severe." 20 C.F.R. § 404.1520(a)(4)(ii). "It is the claimant's burden to establish that his impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citation omitted). An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. See id. at 707; 20 C.F.R. § 416.920(c). The severity showing "is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." Kirby, 500 F.3d at 708 (cleaned up). Second, the ALJ must consider all medically determinable impairments, whether severe or not, in assessing the claimant's RFC. 20 C.F.R. §§ 404.1545(a)(2) ("We will consider all of your medically

---

[17] Plaintiff has not contested the ALJ's assessment of the opinion evidence and thus the Court declines to address defendant's argument that the ALJ properly rejected Ms. Allen's opinion.

determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity.").

Eighth Circuit "precedent indicates that the failure to list a specific impairment at step two is not an error unless the impairment is 'separate and apart' from the other listed impairments." Gregory v. Comm'r, Soc. Sec. Admin., 742 F. App'x 152, 156 (8th Cir. 2018). Here, however, plaintiff's alleged depression and sleep apnea are separate and apart from the abnormalities of the spine, hypertension, and obesity that the ALJ considered at step 2. Even so, a failure to find severe impairments at step two "may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe." Haley v. Colvin, No. 2:13CV29 CDP, 2014 WL 117575, at *10 (E.D. Mo. Jan. 13, 2014) (citing Lorence v. Astrue, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); see also Weed v. Saul, No. 4:18-CV-001192-SPM, 2019 WL 4451259, at *4 (E.D. Mo. Sept. 17, 2019) (ALJ's error in failing to consider sleep apnea at step two harmless because ALJ considered all of plaintiff's symptoms, including those associated with sleep apnea, which she testified overlapped entirely with her symptoms from fibromyalgia, which the ALJ did consider); Spainhour v. Astrue, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC."); Givans v. Astrue, No. 4:10-CV-417-CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012) (holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to be severe, the error was harmless because the ALJ found other severe impairments and considered both those impairments and the plaintiff's non-severe impairments when determining the RFC). Defendant asserts that the ALJ here did consider all of plaintiff's

impairments before determining plaintiff's RFC.  [Doc. # 19 at 12].  That may indeed be the case but there is no evidence of that consideration in the written decision, which does not address any nonexertional impairments that could be attributable to depression or sleep apnea.

Where, as here, the ALJ fails to consider an impairment at either step two or in determining the RFC, the error is not harmless.  Haley, 2014 WL 117575, at *10.  While there is evidence that plaintiff's depression and sleep apnea were managed and could be considered nonsevere, "[i]t is for the administrative fact-finder, in the first instance, to make this kind of choice, guided by the proper legal standard."  Id. (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)). "Courts should not make this determination in the first instance, unless the case is clear beyond substantial doubt, which this case is not."  Id.

Accordingly, this matter will be remanded for further consideration of plaintiff's depression and sleep apnea.

**B.    Listing 1.04**

Plaintiff contends that the ALJ erred in failing to find that his impairments meet listing 1.04 and in failing to obtain the opinion of an expert as to whether the listing was equaled.

When, as here, an ALJ has found a claimant to have a severe impairment, then at step three of the analysis, the ALJ determines whether the impairment meets or equals one of the presumptively disabling impairments listed in the regulations; if it does, then the claimant is considered disabled.  Here, the ALJ found that plaintiff's severe impairments did not meet or equal any of the listings, including listing 1.04.  (Tr. 13-14).  While the ALJ discussed the listings for hypertension and obesity in some detail, the ALJ summarily stated that the listing 1.04 was not satisfied.

Plaintiff asserts that he meets listing 1.04A, which defines musculoskeletal spinal impairments as:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A).

"An impairment that manifests only some of these criteria, no matter how severely, does not qualify."  Twyford v. Comm'r, Soc. Sec. Admin., 929 F.3d 512, 517 (8th Cir. 2019) (citation and alteration omitted).

The ALJ found that plaintiff had "disorders of the spine" as required to meet the listing's first requirement.  See Tr. 13 (listing abnormalities of the spine, including degenerative disc disease, disc disorder, spondylosis, and stenosis).  With respect to the paragraph A requirements, plaintiff periodically had positive bilateral straight-leg raising tests, but there is no indication whether they were both sitting and supine and thus the Court cannot say that he meets the listing with respect to his lower back.  The picture regarding his cervical spine is less straightforward. The evidence is that he had severe bilateral encroachment and mild central canal stenosis at multiple levels of the cervical spine.  (Tr. 330).  As defendant acknowledges,

> Foraminal encroachment means that degeneration in the spinal column has caused an obstruction of the foramina, which are the open spaces on either side of the vertebrae through which spinal nerves pass on their way to other parts of the body. As these neural passageways become blocked, it can force pressure on the nerves, which causes pain at the site of the impinged nerve as well as symptoms that travel to the extremities.

22

See Doc. #19 at 6 n.1 (citing http://www.lb7.uscourts.gov/documents/14-33232.pdf (last visited Apr. 2, 2020)).   Neither party has addressed whether a finding of severe bilateral foraminal encroachment constitutes evidence of nerve impingement.  With respect to the other criteria for listing 1.04A, plaintiff repeatedly exhibited reduced range of motion of the cervical spine, weakness of the cervical spine, decreased sensation of the forearm, and numbness in his hands.  At least once, he had decreased sensation in his index fingers.  Because this matter is being remanded for further consideration of plaintiff's depression and sleep apnea, the ALJ will have the opportunity to address listing 1.04A in greater detail.

### C.      Conflicts between the vocational expert and DOT

The ALJ stated:

> At the hearing, the vocational expert was asked whether an individual with the claimant's residual functional capacity could perform his past work.  The vocational expert testified that such an individual would be able to perform the claimant's past work.  The claimant's past work was classified as light work, and the claimant's residual functional capacity is at the light work exertional standard.  The finding of the vocational expert, which was uncontradicted and consistent with the Dictionary of Occupational Titles, is accepted.

(Tr. 19).  Plaintiff argues that the ALJ incorrectly found that the vocational expert's testimony is consistent with the DOT and, further, that the vocational expert incorrectly testified that his work was performed at the light rather than sedentary level.

The vocational expert testified that the DOT described work as a substance abuse counselor as sedentary but that plaintiff performed the work at the light level.  The full range of light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying up to 10 pounds. In addition, "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.  In his work activity report, plaintiff stated that his job required him to sit for

four hours, walk for two hours, and stand for two hours.  (Tr. 222-24).  He stated in the report that he frequently lifted less than 10 pounds and that the heaviest weight he lifted was 20 pounds, although he clarified at the hearing that he lifted less than 20 pounds in his work.  (Tr. 59).  In the RFC determination, the ALJ found that plaintiff had the capacity to sit for four hours and walk and stand for six hours.  (Tr. 14).

Defendant argues that none of the activities required to perform plaintiff's past work as he actually performed it exceed the limitations of the ALJ's RFC determination and thus the ALJ's decision should be affirmed.  Plaintiff argues that the ALJ was required to make further inquiry of the vocational expert's opinion that he performed his work at the light exertional level.  On remand, the ALJ will have the opportunity to reexamine the requirements of plaintiff's past work and whether it is consistent with the DOT and his RFC.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

_/s/ John M. Bodenhausen_____
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of June, 2020.

24